Barry I. Levy, Esq.
Michael Vanunu, Esq.
Philip P. Nash, Esq.
Wallis Levy Granat, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Company,*
*GEICO Indemnity Company, GEICO General Insurance Company*
*and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY,
GEICO GENERAL INSURANCE COMPANY and
GEICO CASUALTY COMPANY,

Docket No.: _____(      )

Plaintiffs,

-against-

**Plaintiffs Demand a**
**Trial by Jury**

DIVERSIFIED ORTHOTICS INC., LOUIS ALFRED ROSE,
and JOHN DOE DEFENDANTS "1" – "10",

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## COMPLAINT

Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO

General Insurance Company and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

## NATURE OF THE ACTION

1.      GEICO brings this action to recover more than $497,000.00 that Defendants

Diversified Orthotics Inc. ("Diversified Orthotics"), Louis Alfred Rose ("Rose"), and John Doe

Defendants "1" through "10" (collectively, the "Defendants"), have wrongfully obtained from

1

GEICO by submitting and causing to be submitted to GEICO hundreds of fraudulent No-fault insurance charges relating to specifically targeted, medically unnecessary, illusory, and otherwise non-reimbursable durable medical equipment ("DME") stylized as low level laser therapy devices ("LLLT Device"), Pain Shield Pro devices, and Pain Shield Patch Kits (collectively, the "Fraudulent Equipment") through Diversified Orthotics. These goods were allegedly provided to individuals who were involved in automobile accidents and were eligible for "No-Fault" insurance coverage under GEICO insurance policies (the "Insureds").

2.      Diversified Orthotics is a DME and OD supplier allegedly owned and controlled by Rose. Rose, in association with individuals not presently identifiable to GEICO, devised a fraudulent scheme to submit large volumes of billing to GEICO and other New York automobile insurance companies for the specifically-targeted types of Fraudulent Equipment by colluding with various No-Fault medical "mills" (the "Clinics"), unlicensed laypersons and managers of the Clinics who are not presently identifiable ("the Clinic Controllers"), and various physicians and other healthcare providers (the "Referring Providers") to prescribe the Fraudulent Equipment to the Insureds treating at the Clinics.

3.      GEICO seeks to terminate this fraudulent scheme and to recover more than $497,000.00 that has been wrongfully obtained by the Defendants since 2024. GEICO further seeks a declaration that it is not legally obligated to pay reimbursement of more than $700,000.00 in pending no-fault insurance claims that have been submitted by the Defendants in the name Diversified Orthotics because:

> (i)      The Defendants billed GEICO for Fraudulent Equipment pursuant to a fraudulent scheme that was designed and implemented to exploit Insureds for financial gain so as to benefit the Defendants and others not presently known (i.e. the John Doe Defendants), without regard for genuine patient care, and which included dispensing Fraudulent Equipment that was not medically necessary and which was prescribed pursuant to predetermined

2

fraudulent protocols, including prescriptions secured through collusive arrangements, and were otherwise illegitimate because they contained photocopied, electronically generated, and/or otherwise duplicated signatures; and

(ii)    Defendants made false and fraudulent statements to GEICO concerning the maximum permissible reimbursement rate they were entitled to receive for Fraudulent Equipment they allegedly provided to Insureds in order to obtain from GEICO payment under the New York "No-Fault" laws to which they are not entitled.

4.    Defendants fall into the following categories:

(i)    Defendant Diversified Orthotics is a New York corporation that is used as the billing arm of the fraudulent scheme – it purports to purchase Fraudulent Equipment from various wholesale DME and OD dealers. Diversified Orthotics then purportedly dispenses Fraudulent Equipment to automobile accident victims while systematically submitting fraudulently inflated claims to GEICO and other New York automobile insurers;

(ii)    Defendant Rose is one of the primary drivers of the fraudulent scheme – he owns and controls Diversified Orthotics and submitted to GEICO and other New York insurers fraudulently inflated bills seeking reimbursement for Fraudulent Equipment purportedly dispensed by Diversified Orthotics to automobile accident victims; and

(iii)   The John Doe Defendants are the other individuals involved in the fraudulent scheme – while they are not presently identifiable, they include the Clinic Controllers who are associated with the Clinics and have colluded with Defendants to further drive and financially benefit from the fraudulent scheme committed against GEICO and other New York automobile insurers through their associations with the Referring Providers and control of the Clinics.

5.    As discussed below, Defendants have always known that the claims for Fraudulent Equipment submitted to GEICO were fraudulent because: (i) the billing submitted to GEICO and other New York automobile insurers was pursuant to a fraudulent scheme that was designed and implemented to exploit Insureds for financial gain so as to benefit the Defendants and others not presently known (i.e. the John Doe Defendants), without regard for genuine patient care, and which included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, including prescriptions secured through collusive

3

arrangements; and (ii) the bills fraudulently mispresented the type and nature of the Fraudulent Equipment purportedly provided to the Insureds and intentionally inflated the charges to GEICO based upon an exploitation of the payment formulas set forth in New York's "No-Fault" laws.

6.      As such, Defendants do not now have – and never had – any right to be compensated for the Fraudulent Equipment billed to GEICO through Diversified Orthotics.

7.      The chart attached hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that have been identified to date that were submitted, or caused to be submitted, to GEICO pursuant to Defendants' fraudulent scheme through Diversified Orthotics.

8.      Defendants' fraudulent scheme against GEICO and the New York automobile insurance industry began no later than March 2024 and the scheme has continued uninterrupted through the present day, as Defendants continue to seek collection on pending charges for the Fraudulent Equipment.

9.      As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $497,000.00, which represents payments voluntarily made by GEICO for the Fraudulent Equipment based on the billing submitted by the Defendants.

## THE PARTIES

### I.    Plaintiffs

10.     Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

## II.    **Defendants**

11.    Defendant Rose resides in and is a citizen of New York and is identified as the paper owner of Diversified Orthotics.  Rose, at all relevant times, has been one the primary drivers of the fraudulent scheme, owns, operates, and controls Diversified Orthotics, conspired and colluded with others not presently identifiable to obtain the illegitimate and medically unnecessary prescriptions from the Referring Providers and used those prescriptions to submit bills to GEICO and other New York automobile insurance companies for the Fraudulent Equipment.

12.    Defendant Diversified Orthotics is a New York corporation that was incorporated on or about December 21, 1993, and has its principal place of business in Bronx, New York. At all relevant times, Diversified Orthotics has been owned and operated by Rose and has been used by Rose as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

13.    John Doe Defendants "1" – "10" are citizens of New York who are not presently identifiable and include the Clinic Controllers associated with the Clinics, who are not licensed healthcare professionals but who unlawfully own and control the Clinics and the relationships with the Referring Providers, and who have conspired with Diversified Orthotics and Rose to further the fraudulent scheme committed against GEICO and other New York automobile insurers for their own economic benefit.

## JURISDICTION AND VENUE

14.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

15.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.  In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

16.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where a substantial amount of the activities forming the basis of the Complaint occurred and is the District where one or more of Defendants reside.

## ALLEGATIONS COMMON TO ALL CLAIMS

17.     GEICO underwrites automobile insurance in the State of New York.

## I.     An Overview of the Pertinent Laws

### A.     Pertinent Laws Governing No-Fault Insurance Reimbursement

18.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.

19.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

20.     In New York, No-Fault Benefits include up to $50,000.00 per Insured for medically necessary expenses that are incurred for healthcare goods and services, including goods for DME and OD.  See N.Y. Ins. Law § 5102(a).

21.     In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "New York Fee Schedule").

22.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York.

23.     Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary goods and services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

24.     In the alternative, a healthcare service provider may submit claims using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500" or "CMS-1500 form").

25.     Pursuant to Section 403 of the New York State Insurance Law, the NF-3 Forms submitted by healthcare service providers to GEICO, and to all other insurers, must be verified subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

26.     Similarly, all HCFA-1500 (CMS-1500) forms submitted by a healthcare service provider to GEICO, and all other automobile insurers, must be verified by the healthcare service provider, subject to the following warning:

Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete, or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

**B.    Pertinent Statutes and Regulations Relating to No-Fault Benefits, DME and OD**

27.    Under the No-Fault Laws, No-Fault Benefits can be used to reimburse medically necessary DME or OD that was provided pursuant to a lawful prescription from a licensed healthcare provider.  See N.Y. Ins. Law § 5102(a).  By extension, DME or OD that was provided without a prescription, pursuant to an unlawful prescription, or by reason of a decision of a layperson or individual not lawfully licensed to provide prescriptions, is not reimbursable under No-Fault.

28.    Under New York State's Public Health Law, "a practitioner may not make a referral to a health care provider for the furnishing of any health or health related items or services where such practitioner . . . has any of the following financial relationships without disclosing to the patient such financial relationship: . . . (b) a compensation arrangement".  See N.Y. P.H.L. § 238-d(1).  A practitioner is defined to include "a licensed or registered physician, dentist, podiatrist, chiropractor, nurse, midwife, physician assistant or specialist assistant, physical therapist, or optometrist".  See N.Y. P.H.L. § 238(11).

29.    A health care provider is defined to include "a purveyor of health or health related supplies, appliances or equipment", which is a DME supplier such as Diversified Orthotics.  See N.Y. P.H.L. §238(6).  A compensation arrangement, as referenced in N.Y. P.H.L. § 238-d, includes any remuneration, whether directly, indirectly, overly, covertly, in cash, or in kind that is between a practitioner and a health care provider.  See N.Y. P.H.L. § 238-a(5)(a)

30.    DME generally consists of items that can withstand repeated use and primarily consists of items used for medical purposes by individuals in their homes.  For example, DME can

include items such as bed boards, cervical pillows, orthopedic mattresses, electronic muscle stimulator units ("EMS units"), hot/cold packs, infrared heat lamps, lumbar cushions, orthopedic car seats, transcutaneous electrical nerve stimulators ("TENS units"), electrical moist heating pads (known as thermophores), cervical traction units, whirlpool baths, and osteogenesis stimulators.

31.    OD consists of instruments that are applied to the human body to align, support, or correct deformities, or to improve the movement of the spine, joints, or limbs. These devices come in direct contact with the outside of the body, and include such items as cervical collars (i.e., "whiplash" collars), lumbar supports, shoulder supports, knee supports, ankle supports, wrist braces, and the like.

32.    To ensure that each Insured's $50,000.00 in minimum No-Fault Benefits is not artificially depleted by inflated DME or OD charges, the maximum charges that may be submitted by healthcare providers for DME and OD are set forth in the New York Fee Schedule.

33.    In a June 16, 2004 Opinion Letter entitled "No-Fault Fees for Durable Medical Equipment", the New York Insurance Department recognized the harm inflicted on Insureds by inflated DME and OD charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

34.    As it relates to DME and OD, the New York State Workers' Compensation Board adopted the New York State Workers' Compensation Durable Medical Equipment Fee Schedule ("Fee Schedule") that became effective on April 4, 2022.

35.    Among other things, the Fee Schedule limited the reimbursement rates of certain previously abused DME charges and established a maximum permissible charge for certain

9

specifically-listed pieces of DME ("Fee Schedule item"). The charges for the reimbursement of DME by the New York State Workers' Compensation Board are reflected in 12 N.Y.C.R.R. § 442.2 (2022).

36.     As it relates to DME, the New York Fee Schedule sets forth the maximum charges as follows:

(a)     The maximum permissible charge for the purchase of durable medical equipment… and orthotic [devices] . . . shall be the fee payable for such equipment or supplies under the New York State Medicaid program at the time such equipment and supplies are provided . . . if the New York State Medicaid program has not established a fee payable for the specific item, then the fee payable, shall be the lesser of:

(1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts, or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or

(2) the usual and customary price charged to the general public.

See 12 N.Y.C.R.R. § 442.2.

37.     Similarly, effective June 1, 2023, the New York State Department of Financial Services issued an amendment to 11 N.Y.C.R.R. 68, adding Part E of Appendix 17-C, to address No-Fault reimbursement for DME that is not specifically identified by the Fee Schedule ("Non-Fee Schedule item").

38.     For Non-Fee Schedule items that are provided by a DME/OD supplier, the maximum permissible reimbursement rate is the lesser of: (1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or (2) the usual and customary price charged to the general public. See 11 N.Y.C.R.R. 68, Appendix 17-C, Part E.

39.     For Fee Schedule items, Palmetto GBA, LLC ("Palmetto"), a contractor for the

Center for Medicare & Medicaid Services ("CMS"), was tasked with analyzing and assigning Healthcare Common Procedure Coding System ("HCPCS") Codes that should be used by DME and OD companies to seek reimbursement for – among other things – Fee Schedule items.  The HCPCS Codes and their definitions provide specific characteristics and requirements that an item of DME or OD must meet in order to qualify for reimbursement under a specific HCPCS Code.

40.    For Non-Fee Schedule items, the New York State Insurance Department recognized that a provider's acquisition cost must be limited to costs incurred by a provider in a "bona fide arms-length transaction" because "[t]o hold otherwise would turn the No-Fault reparations system on its head if the provision for DME permitted reimbursement for 150% of any documented cost that was the result of an improper or collusive arrangement."  See New York State Insurance Department, No-Fault Fees for Durable Medical Equipment, June 16, 2004 Opinion Letter.

41.    Accordingly, when a healthcare provider submits a bill to collect charges from an insurer for DME or OD using either a NF-3 or HCFA-1500 form, the provider represents – among other things – that:

(i)    The provider is in compliance with all significant statutory and regulatory requirements;

(i)    The provider received a legitimate prescription that was not issued contrary to the requirements of applicable laws and is for reasonable and medically necessary DME and/or OD from a healthcare practitioner that is licensed to issue such prescriptions;

(ii)    The DME or OD identified in the bill was actually provided to the patient based upon a legitimate prescription;

(iii)    The HCPCS Code identified in the bill actually represents the DME or OD that was provided to the patient; and

(iv)    The fee sought for the DME or OD provided to an Insured was not in excess of the price contained in the Fee Schedule or the standard used for a Non-Fee Schedule item.

## II.    **Defendants' Fraudulent Scheme**

### A.    **Overview of Defendants' Fraudulent Scheme**

42.    Beginning in or about March 2024, Defendants masterminded and implemented a complex fraudulent scheme for the provision of prescriptions for Fraudulent Equipment in which Diversified Orthotics was used as a vehicle to bill GEICO and other New York automobile insurers over $1.4 million in No-Fault benefits to which it was never entitled to receive.

43.    The scheme centered around colluding with the John Doe Defendants associated with the Clinics whereby Referring Providers would purportedly issue prescriptions for three types of medically unnecessary Fraudulent Equipment - a low level laser therapy device, a Pain Shield Pro device, and a Pain Shield Patch Kit – and these prescriptions would be routed directly to the Defendants and used as the basis to submit billing to GEICO.

44.    Prior to their entry into the scheme involving the Fraudulent Equipment, the Defendants billed GEICO beginning in 2014 for various types of DME and OD, which, true to the name Diversified Orthotics, primarily consisted of different types of orthotics devices including orthotics for the lumbar spine, shoulder, and knee and did not include any billing for the specifically targeted Fraudulent Equipment.

45.    Then in March 2024, the Defendants entered into the collusive arrangements with the John Doe Defendants for the provision of prescriptions for the specifically targeted Fraudulent Equipment which dramatically and exponentially increased their billing to GEICO.

46.    For example, from 2014 through 2023, Diversified Orthotics submitted, in total, $178,868.32 in billing to GEICO which did not include any billing for the specifically targeted

Fraudulent Equipment.

47.     Then, in March 2024, the Defendants began receiving prescriptions for the Fraudulent Equipment from the Clinics and submitted over $650,000.000 in billing to GEICO for Fraudulent Equipment alone.

48.      The Defendants' billing for Fraudulent Equipment in just March 2024 is 350% more than the Defendants' total billing to GEICO for the nine prior years from 2014 to 2023.

49.     Further, the March 2024 billing for Fraudulent Equipment alone is 6,700% more than the total amount Diversified Orthotics billed GEICO for the prior year in 2023.

50.     Absent their collusive relationships with the John Doe Defendants for the provision of prescriptions for this Fraudulent Equipment, there is no legitimate explanation for the Defendants' dramatic increase in billing centered around just three types of Fraudulent Equipment.

51.     Rose used Diversified Orthotics to directly obtain No-Fault benefits and maximize the amount of No-Fault Benefits he could obtain by submitting fraudulent bills to GEICO and other automobile insurers seeking reimbursement for the Fraudulent Equipment.

52.     From March 2024 to the present, Defendants, through Diversified Orthotics, submitted more than $1.4 million in fraudulent claims to GEICO seeking reimbursement for the Fraudulent Equipment. To date, the Defendants have wrongfully obtained more than $497,000.00 from GEICO, and there is more than $700,000.00 in additional fraudulent claims that have yet to be adjudicated, but which the Defendants continue to seek payment from GEICO.

53.     As part of the fraudulent scheme, Defendants colluded with various Clinics, Clinic Controllers, and Referring Providers, including paying kickbacks to the Clinic Controller and John Doe Defendants associated with the Clinics, in order to obtain prescriptions for Fraudulent Equipment, which in turn permitted Diversified Orthotics to bill GEICO more than $1.4 million

by dispensing the specifically targeted and medically unnecessary Fraudulent Equipment solely to maximize profits.

54.     The prescriptions obtained by Defendants were part of predetermined protocols to maximize profits, were not based on medical necessity, and resulted in Diversified Orthotics dispensing, or purporting to dispense, the specifically targeted and medically unnecessary items of Fraudulent Equipment of virtually the same type to each of the Insureds, unrelated to the Insured's individual symptoms or presentation.

55.     As part of the scheme, and to maximize the amount of money that Defendants could obtain from GEICO and other automobile insurers, Defendants obtained prescriptions for Fraudulent Equipment from the Clinics that were never actually issued by the Referring Provider as they contained an electronically generated and/or photocopied signature on the prescription.

56.     In many instances, the Clinic Controllers or John Doe Defendants associated with the Clinics created these prescriptions for Fraudulent Equipment and had them routed directly to the Defendants and completely bypassing the Insureds.

57.     Once Defendants received these sham prescriptions purportedly issued by Referring Providers from the Clinic Controllers, Diversified Orthotics would submit either NF-3 or HCFA-1500 forms to GEICO seeking reimbursement for Fraudulent Equipment that was purportedly provided to the Insureds.

58.     By submitting bills to GEICO seeking No-Fault Benefits for Fraudulent Equipment based upon specific HCPCS Codes, Diversified Orthotics indicated that it provided Insureds with the particular items associated with each unique HCPCS Code, and that such specific item was medically necessary as determined by a healthcare provider licensed to prescribe DME and/or OD.

59.     The Defendants also submitted bills for Non-Fee Schedule items that falsely indicated they were seeking reimbursement at the lesser of 150% of the Defendants' legitimate acquisition cost or the cost to the general public for the same item.

60.     In actuality, the bills from the Defendants submitted to GEICO for Non-Fee Schedule items contained grossly inflated reimbursement rates that did not accurately represent the lesser of 150% of the Defendants' legitimate acquisition cost or the cost to the general public.

61.     The Defendants submitted bills to GEICO, and other automobile insurers, seeking No-Fault Benefits for Non-Fee Schedule items at rates that were grossly above the permissible reimbursement amount for Non-Fee Schedule items in order to maximize the amount of No-Fault Benefits that they could receive.

62.     Instead, Defendants were able to perpetrate the scheme through collusive arrangements with the Clinic Controllers and Referring Providers, either directly or through third-party individuals who are not presently identifiable.

63.     After obtaining prescriptions for Fraudulent Equipment as a result of their collusive relationships with the Clinic Controllers and other John Doe Defendants, Defendants in turn then billed GEICO for: (i) Fraudulent Equipment that was not reasonable nor medically necessary; (ii) Fraudulent Equipment that did not represent the HCPCS codes contained in the bills to GEICO; and (iii) Fraudulent Equipment with inflated charges that far exceeded the value of the actual products they provided to GEICO's Insureds.

**B.     The Fraudulent Scheme - Predetermined Fraudulent Protocols Associated with the Prescriptions**

64.     The Defendants were able to obtain prescriptions that could be used as a basis to submit bills to GEICO through predetermined fraudulent protocols that were established between and among the Defendants, the Clinic Controllers and other John Defendants, and the Referring

15

Providers.

65.     Through these predetermined fraudulent protocols, the Defendants obtained prescriptions for Fraudulent Equipment that were not medically necessary and were created solely to financially enrich the Defendants and John Doe Defendants, not to genuinely treat the Insureds.

66.     As set forth below, the extent of the Insureds' motor vehicle accidents, physical conditions, and conservative treatment plans demonstrate a pattern of prescribing and dispensing Fraudulent Equipment to the Insureds that were not medically necessary to treat the Insureds post-accident condition.

67.     Virtually all of the Insureds who were prescribed the Fraudulent Equipment identified in Exhibit "1", were involved in relatively minor and low-impact "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

68.     Concomitantly, almost none of the Insureds identified in Exhibit "1", whom the Referring Providers purported to treat, suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

69.     In keeping with the fact that the Insureds identified in Exhibit "1" suffered only minor injuries – to the extent they had any injuries at all – as a result of the relatively minor accidents, many of the Insureds did not seek medical treatment at any hospital as a result of their accidents.

70.     To the extent the Insureds in the claims identified in Exhibit "1" did seek treatment at a hospital following their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way with nothing more serious than a minor soft tissue injury, such as a sprain or strain.

71.     However, despite virtually all of the Insureds being involved in relatively minor and low-impact accidents and only suffering from sprains and strains – to the extent that the Insureds were actually injured – virtually all of the Insureds were subject to extremely similar treatment protocols at the Clinics regarding the prescribing of Fraudulent Equipment.

72.     There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in an automobile accident.

73.     For example, an individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

74.     The prescriptions for Fraudulent Equipment that were purportedly issued to the Insureds identified in Exhibit "1" were issued pursuant to predetermined fraudulent protocols set forth at each Clinic, and not because the Fraudulent Equipment was medically necessary for each Insured based upon his or her individual symptoms or presentations.

75.     For example, the predetermined fraudulent protocols at each Clinic (i) included issuing predetermined sets of Fraudulent Equipment that applied to virtually all Insureds, regardless of each patient's individual symptoms or presentation, and (ii) were not based upon what was medically necessary for each patient.  Instead, they were created based upon how the John Doe Defendants, and others including the Defendants, could profit from exploiting prescriptions purportedly issued by the Referring Providers.

76.     In other words, no legitimate physician, nurse practitioner, physician's assistant, chiropractor, other licensed healthcare provider, or professional entity would permit prescriptions for Fraudulent Equipment to be issued based upon the fraudulent protocols described below.

77.    In a legitimate setting, when a patient injured in a motor vehicle accident seeks treatment from a healthcare provider, the patient's subjective complaints are evaluated, and the treating provider will direct a specific course of treatment based upon the patients' individual symptoms or presentation.

78.    Furthermore, in a legitimate setting, during a patient's treatment, a healthcare provider <u>may</u> – but generally does not – prescribe DME and/or OD.

79.    In determining whether to prescribe DME and/or OD to a patient – in a legitimate setting – a healthcare provider should evaluate multiple factors, including: (i) whether the specific DME and/or OD could have any negative effects based upon the patient's physical condition and medical history; (ii) whether the DME and/or OD is likely to help improve the patient's complained of condition; and (iii) whether the patient is likely to use the DME and/or OD. In all circumstances, any prescribed DME and/or OD would always directly relate to each patient's individual symptoms or presentation.

80.    If a healthcare provider determines that DME and/or OD is medically necessary after considering a patient's individual circumstances and situations, in a legitimate setting, the healthcare provider will indicate in a contemporaneous medical record, such as an evaluation report, what specific DME and/or OD was prescribed, why it was medically necessary, or how it would help the Insureds.

81.    Further, in a legitimate setting, when a patient returns for an examination after being prescribed DME and/or OD, the healthcare provider will inquire – and appropriately report – whether the previously prescribed DME and/or OD aided the patient's subjective complaints. Such information is typically included so the healthcare provider can recommend a further course of treatment regarding the previously prescribed DME and/or OD or newly issued DME and/or OD.

82.     It is improbable – to the point of an impossibility – that virtually all of the Insureds identified in Exhibit "1" who were treated at a specific Clinic would receive virtually identical prescriptions for Fraudulent Equipment, despite being different ages, in different physical conditions, and involved in different motor vehicle accidents.

83.     It is even more improbable – to the point of impossibility – that virtually all of the Insureds identified in Exhibit "1" who were treated by different Referring Providers at a specific Clinic would receive virtually identical prescriptions for Fraudulent Equipment despite being different ages, in different physical conditions, and involved in different motor vehicle accidents.

84.     Here, and in keeping with the fact that the prescriptions provided to the Defendants were for medically unnecessary Fraudulent Equipment obtained as part of an insurance scheme in which there were predetermined fraudulent protocols, virtually all of the Insureds identified in Exhibit "1" that were treated at a specific Clinic were issued virtually identical prescriptions for a predetermined set of Fraudulent Equipment, despite being different ages, in different physical conditions, and involved in different motor vehicle accidents.

85.     In also in keeping with the fact that the prescriptions for Fraudulent Equipment used by the Defendants were medically unnecessary and obtained as part of predetermined fraudulent protocols, multiple prescriptions purportedly issued by the Referring Providers were issued on dates that the Referring Providers never even treated the Insureds.

86.     Further, there were often significant delays in the time between when Insureds were prescribed the Fraudulent Equipment and when it was purportedly delivered to the Insureds.

87.     To the extent that there was a contemporaneously dated evaluation report issued by the Referring Provider, the evaluation report virtually always failed to explain – and oftentimes failed to identify – the Fraudulent Equipment identified on the prescriptions provided to the

Defendants and used by the Defendants to bill GEICO for the charges identified in Exhibit "1".

88.    Additionally, to the extent there was a follow-up examination after the Referring Provider issued the prescription for Fraudulent Equipment, these reports never referenced or discussed the Insureds' previously prescribed Fraudulent Equipment or medical efficacy of the Fraudulent Equipment, including the Insured's response to such equipment, and virtually never provided any indication whether the Insured should continue using any of the previously prescribed Fraudulent Equipment.

89.    For the reasons set forth above, and below, in each of the claims identified  in Exhibit "1", the Defendants falsely represented that the Fraudulent Equipment was provided pursuant to legitimate prescriptions from healthcare providers for medically necessary DME, and were, therefore, entitled to collect No-Fault Benefits in the first instance, when, in fact, the prescriptions were for medically unnecessary Fraudulent Equipment issued as part of the Defendants insurance fraud scheme.

### 1.    Collusive Arrangements to Obtain Illegitimate and Medically Unnecessary Prescriptions

90.    To gain access to Insureds so that the Defendants could implement and execute their fraudulent scheme and maximize the amount of No-Fault Benefits the Defendants could obtain from GEICO and other New York automobile insurers, the Defendants entered into collusive arrangements with the Clinic Controllers, the Referring Providers, and others who are not presently identifiable in order to direct prescriptions to Diversified Orthotics that were illegitimate and for medically unnecessary Fraudulent Equipment.

91.    Since March 2024, the Defendants engaged in various collusive arrangements with the Clinic Controllers and other John Doe Defendants pursuant to which Defendants paid kickbacks or other financial incentives in exchange for being provided prescriptions to fill from

the Referring Providers for the Fraudulent Equipment that could then be used by Diversified Orthotics to support their charges to GEICO and other New York automobile insurers. The improper financial arrangements were key to the fraudulent scheme in that they allowed the Defendants to submit hundreds of charges for Fraudulent Equipment to GEICO and other New York automobile insurers. However, the collusive nature of the arrangement goes beyond the simple of payment of money or other financial incentives, but includes (i) payment to fictitious businesses associated with the John Doe Defendants, (ii) the ability to secure the prescriptions without ever meeting the Referring Providers, (iii) obtaining the prescriptions directly from the staff at the Clinics, without any communication or involvement by the Insureds, and (iv) providing the Fraudulent Equipment to the Clinic and its staff, with any interaction with the Insureds, and without any interaction with the Defendants.

92.    The collusive arrangements allowed the scheme to remain undetected by the Insureds and allowed the Defendants to access large volumes of prescriptions that in turn afforded them the opportunity to submit charges for thousands of dollars in Fraudulent Equipment for each Insured to GEICO and other automobile insurers. But for the collusive arrangements, neither the John Doe Defendants nor the Referring Providers would have had any reason to direct a substantial volume of these medically unnecessary prescriptions for Fraudulent Equipment to Diversified Orthotics to purportedly fill.

93.    Upon information and belief, the Referring Providers were compensated by the John Doe Defendants, whether financially or through some other economic quid pro quo (e.g. the ability to treat the Insured and independently bill GEICO), for the Referring Providers' willingness to permit prescriptions to be issued in their names and to be given to DME suppliers, including Diversified Orthotics, rather than given to the Insureds or to a bona-fide DME/OD retailer, who

21

would likely question its legitimacy.

94.     The collusive relationship between the Defendants and John Doe Defendants in relation to the prescriptions are the very kind of arrangement that is prohibited by N.Y. Public Health Law § 238-d, without a specific disclosure to the patient of the financial relationship between the Referring Provider and Diversified Orthotics. In actuality, no such disclosure required by Public Health Law § 238-d was ever disclosed to the Insureds identified in Exhibit "1". Rather, because of the nefarious nature of the relationship between the Defendants and the John Doe Defendants, the arrangements between and among the Defendants, John Doe Defendants, and Referring Providers was concealed from the Insureds.

95.     As a result of these collusive relationships, the Defendants (rather than the Insured or a bona-fide DME retailer) were given the illegitimate prescriptions, which (i) were medically unnecessary Fraudulent Equipment that was not based upon each Insured's individual need; (ii) contained an electronically generated and/or photocopied signature of the Referring Provider; (iii) were issued on a date the Referring Provider did not treat or otherwise examine the Insured; (iv) were pre-signed/boilerplate with the patient names changed; and/or (v) were not signed by the listed healthcare provider.

96.     Furthermore, in a legitimate setting, prescriptions – including prescriptions for DME and pharmaceuticals - are supposed to include directions for use, meaning instructions for the patients describing: (i) what the patient is supposed to do; (ii) how often the patient should do it; and (iii) how long the patient should keep doing it.

97.     However, the prescriptions purportedly issued by the Referring Providers, and which Diversified Orthotics used to support many of the charges identified in Exhibit "1", failed to provide any instruction to the Insureds regarding how often and how long they were supposed

22

to use the Fraudulent Equipment.

98.     Further illustrative of the fact that the collusive relationships between the Defendants, Clinic Controllers, and other John Doe Defendants was designed to obtain illegitimate prescriptions associated with Insureds treating at the Clinics, the Defendants received prescriptions from the Clinics that contained electronically generated and/or photocopied signatures of the Referring Providers, such as the following representative examples:

Sonia Sikand Atlantic Medical Photocopied/Electronically Generated Prescriptions

| Example | Date of Prescription | Sample Signatures |
|---|---|---|
| Prescription to Diversified Orthotics for Insured DC | 1/30/2024 | |
| Prescription to Diversified Orthotics for Insured JD | 1/12/2024 | |
| Prescription to Diversified Orthotics for Insured JD | 1/24/2024 | |
| Prescription to Diversified Orthotics for Insured KA | 3/2/2024 | |
| Prescription to Diversified Orthotics for Insured MG | 2/2/2024 | |

Aleksandr Kopach Atlantic Medical Photocopied/Electronically Generated Prescriptions

| Example | Date of Prescription | Sample Signatures |
|---|---|---|
| Prescription to Diversified Orthotics for Insured RD | 4/30/2024 | |
| Prescription to Diversified Orthotics for Insured VS | 1/9/2024 | |
| Prescription to Diversified Orthotics for Insured WH | 2/13/2024 | |

Wei Hong Xu Atlantic Medical Photocopied/Electronically Generated Prescriptions

| Example | Date of Prescription | Sample Signatures |
|---|---|---|
| Prescription to Diversified Orthotics for Insured AA | 1/30/2024 | |

| Prescription to Diversified Orthotics for Insured LA | 2/12/2024 | |
|---|---|---|
| Prescription to Diversified Orthotics for Insured MA | 1/30/2024 | |
| Prescription to Diversified Orthotics for Insured NC | 1/18/2024 | |
| Prescription to Diversified Orthotics for Insured SM | 1/30/2024 | |

Nicola Houslin Atlantic Medical Photocopied/Electronically Generated Prescriptions

| Example | Date of Prescription | Sample Signatures |
|---|---|---|
| Prescription to Diversified Orthotics for Insured CC | 2/29/2024 | |
| Prescription to Diversified Orthotics for Insured EK | 1/25/2024 | |
| Prescription to Diversified Orthotics for Insured TS | 1/11/2024 | |

99.    The Defendants were able to obtain these illegitimate prescriptions for Fraudulent Equipment due to their collusive arrangements with the Clinic Controllers and other John Doe Defendants at each of the Clinics, which gave them access to the illegitimate prescriptions.

100.    In contrast to a bona fide DME retailer, the Defendants were willing to obtain illegitimate prescriptions through collusive arrangements and submit the illegitimate prescriptions to support their charges to GEICO and other automobile insurers

101.    These Clinics included, but were not limited to: (i) 11 East Hawthorne Avenue, Valley Stream, New York; (ii) 13742 Guy R. Brewer Boulevard, Jamaica, New York (the "Brewer Boulevard Clinic"); (iii) 3140B East Tremont Ave, Bronx, New York (the "East Tremont Clinic"); (iv) 3209 Fulton Street, Brooklyn, New York (the "Fulton Street Clinic"); (v) 5205 Church Avenue, Brooklyn, New York; (vi) 611 East 76th Street, Brooklyn, New York; (vii) 6503 Grand Avenue, Maspeth, New York (the "Grand Avenue Clinic"; (viii) 787 Meacham Ave, Elmont, New

York; and (ix) 8940 56th Avenue, Elmhurst, New York (the "56th Avenue Clinic") (collectively, the "Atlantic Medical Clinics").

102.    Although ostensibly organized to provide a range of healthcare services to Insureds at a single location, many of the Clinics operate under the unlawful ownership and control of unlicensed laypersons, with a revolving door of healthcare providers providing treatment to the Insureds and other patients without any continuity of care.

103.    In fact, GEICO has received billing from many of the Clinics from an ever-changing number of healthcare providers, starting and stopping operations without any purchase or sale of a "practice"; without any legitimate transfer of patient care from one professional to another; and without any legitimate reason for the change in provider name, beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's No-Fault insurance system.

104.    For example, GEICO has received billing for purported healthcare services rendered at the Clinic located at 11 East Hawthorne Avenue, Valley Stream, New York from a "revolving door" of over 150 different healthcare providers.

105.    For example, GEICO has also received billing for purported healthcare services rendered at the Clinic located at 3209 Fulton Street, Brooklyn, New York from a "revolving door" of over 150 different healthcare providers.

106.    Unlicensed laypersons, rather than the healthcare professionals working in the Clinics, created and controlled the patient base at the Clinics, and directed fraudulent protocols used to maximize profits for the generation of revenue for their own benefit and the benefit of those with whom they are associated without regard to actual patient care.

### 2. The Predetermined Fraudulent Prescription Protocol at the Clinics

107. Through their collusive arrangements with the John Doe Defendants, Defendants were able to obtain medically unnecessary and otherwise illegitimate prescriptions for Fraudulent Equipment purportedly issued by a variety of Referring Providers who purported to treat Insureds at the Atlantic Medical Clinics (as identified above) pursuant to predetermined fraudulent protocols, which is representative of the type of predetermined prescription protocols established at all the Clinics and serves to further illustrate Defendants' fraudulent scheme.

108. The Insureds identified in Exhibit "1" that were prescribed Fraudulent Equipment from the Atlantic Medical Clinics were typically involved in minor "fender-bender" motor vehicle accidents and then purportedly treated by a variety of healthcare providers at the Atlantic Medical Clinics.

109. The Referring providers associated with the Atlantic Medical Clinics include Sonia Sikand, P.A. ("Sikand"), Alexsandr Kopach, P.A. ("Kopach"), Wei Hong Xu, N.P. ("Hong Xu"), Nicola Houslin, N.P. ("Houslin"), Idy Liang, N.P. ("Liang"), and/or Natasha Jagga, N.P. ("Jagga"), who each purported to treat Insureds at the Atlantic Medical Clinics through Atlantic Medical & Diagnostic PC ("Atlantic Medical").

110. During the course of their treatment at the Atlantic Medical Clinics (which is representative of all the Clinics), the Insureds were regularly prescribed Fraudulent Equipment that was medically unnecessary, not supported by medical records, and was issued pursuant to predetermined fraudulent protocols.

111. Virtually all of the prescriptions for Fraudulent Equipment purportedly issued by Referring Providers at the Atlantic Medical Clinics used preprinted prescription forms. These preprinted prescription forms were distributed to the Atlantic Medical Clinics for the Referring

Providers to sign, and the Referring Providers' signatures were then photocopied and/or electronically generated as part of the Defendants' scheme bill GEICO for medically unnecessary Fraudulent Equipment.

112.    To create the false impression that the devices prescribed by the Referring Providers were medically necessary, the prescriptions contained the following boilerplate language that remained unchanged on the prescriptions issued to the Insureds:

> As the referring provider, I certify that the prescribed order for the medical equipment is necessary based on my diagnosis and as part of my overall treatment plan for my patient.
> As my patient desires more treatment at home and based on my professional opinion the patient should be given access to more therapy tools and resources to use at home, I prescribe PainShield and LED Therapy for the patient's at-home use. These tools should optimize injury outcomes and get patients to heal as efficiently as possible.

113.    These preprinted prescriptions utilized by the Referring Providers make vague reference to an Insured's "diagnosis" without further elaborating on or detailing their complaints, symptoms, or diagnosis or why the Fraudulent Equipment is medically necessary for each specific Insured.

114.    Further, these preprinted prescriptions contained typos that no legitimate practitioner would endorse, stating "Use of these medical devices will help avoid unnecessary *part* and suffering" [emphasis added]:

> I am prescribing these medical devices as part of conservative therapy regiment. Use of these medical devices will help avoid unnecessary part and suffering, as well as delays in recovery time.

115.    In keeping with the fact that the prescriptions for Fraudulent Equipment issued by the Referring Providers at the Atlantic Medical Clinics were medically unnecessary and obtained as part of a predetermined fraudulent protocol, multiple prescriptions purportedly issued by the Referring Providers were issued on dates that the Referring Providers never even treated the Insureds.

116. For example:

(i)    On January 19, 2024, Insured EO was purportedly involved in an automobile accident and thereafter began treatment at the East Tremont Clinic. On February 14, 2024, Jagga purportedly issued a prescription in the name of EO for a low level laser therapy device ("LLLT Device"), Pain Shield Pro, and Pain Shield Patch Kit that was routed to Diversified Orthotics and used as the basis to submit billing to GEICO, despite Jagga not treating or otherwise examining EO on that date.

(ii)   On January 22, 2024, Insured AAG was purportedly involved in an automobile accident and thereafter began treatment at the Fulton Street Clinic. On January 30, 2024, Hong Xu purportedly issued a prescription in the name of AAG for an LLLT, Pain Shield Pro, and Pain Shield Patch Kit that was routed to Diversified Orthotics and used as the basis to submit billing to GEICO, despite Hong Xu not treating or otherwise examining AAG on that date.

(iii)  On February 2, 2024, Insured LA was purportedly involved in an automobile accident and thereafter began treatment at the Fulton Street Clinic. On February 12, 2024, Hong Xu purportedly issued a prescription in the name of LA for an LLLT Device, Pain Shield Pro, and Pain Shield Patch Kit that was routed to Diversified Orthotics and used as the basis to submit billing to GEICO, despite Hong Xu not treating or otherwise examining LA on that date.

(iv)   On January 10, 2024, Insured NC was purportedly involved in an automobile accident and thereafter began treatment at the Fulton Street Clinic. On January 18, 2024, Hong Xu purportedly issued a prescription in the name of NC for an LLLT Device, Pain Shield Pro, and Pain Shield Patch Kit that was routed to Diversified Orthotics and used as the basis to submit billing to GEICO, despite Hong Xu not treating or otherwise examining NC on that date.

(v)    On January 22, 2024, Insured MVA was purportedly involved in an automobile accident and thereafter began treatment at the Fulton Street Clinic. On January 30, 2024, Hong Xu purportedly issued a prescription in the name of MVA for an LLLT Device, Pain Shield Pro, and Pain Shield Patch Kit that was routed to Diversified Orthotics and used as the basis to submit billing to GEICO, despite Hong Xu not treating or otherwise examining MVA on that date.

(vi)   On February 12, 2024, Insured DM was purportedly involved in an automobile accident and thereafter began treatment at the 56th Avenue Clinic. On February 15, 2024, Liang purportedly issued a prescription in the name of DM for an LLLT Device, Pain Shield Pro, and Pain Shield Patch Kit that was routed to Diversified Orthotics and used as the basis to submit billing to GEICO, despite Liang not treating or otherwise examining DM on that date.

(vii)  On January 30, 2024, Insured JD was purportedly involved in an automobile accident and thereafter began treatment at the 56th Avenue Clinic. On February

28

8, 2024, Liang purportedly issued a prescription in the name of JD for an LLLT Device, Pain Shield Pro, and Pain Shield Patch Kit that was routed to Diversified Orthotics and used as the basis to submit billing to GEICO, despite Liang not treating or otherwise examining JD on that date.

(viii)    On February 21, 2024, Insured KA was purportedly involved in an automobile accident and thereafter began treatment at the Grand Avenue Clinic. On March 2, 2024, Sikand purportedly issued a prescription in the name of KA for an LLLT Device, Pain Shield Pro, and Pain Shield Patch Kit that was routed to Diversified Orthotics and used as the basis to submit billing to GEICO, despite Sikand not treating or otherwise examining KA on that date.

(ix)    On January 6, 2024, Insured JD was purportedly involved in an automobile accident and thereafter began treatment at the Brewer Boulevard Clinic. On January 12, 2024, Sikand purportedly issued a prescription in the name of JD for an LLLT Device and Pain Shield Pro that was routed to Diversified Orthotics and used as the basis to submit billing to GEICO, despite Sikand not treating or otherwise examining JD on that date.

(x)    On January 22, 2024, Insured ACB was purportedly involved in an automobile accident and thereafter began treatment at the 56th Avenue Clinic. On January 31, 2024, Sikand purportedly issued a prescription in the name of ACB for an LLLT Device, Pain Shield Pro, and Pain Shield Patch Kit that was routed to Diversified Orthotics and used as the basis to submit billing to GEICO, despite Sikand not treating or otherwise examining ACB on that date.

117.    These are representative examples.

118.    In further support of the fact that prescriptions for Fraudulent Equipment issued at the Atlantic Medical Clinics were issued pursuant to a predetermined protocol, in some instances Insureds were purportedly issued two separate prescriptions for the same exact Fraudulent Equipment just days apart.

119.    One prescription was purportedly issued by the Referring Provider on a date where the Insured underwent an examination with the Referring Provider while the second prescription was issued on a date the Referring Provider did not treat or otherwise examine the Insured, with one of these prescriptions being used by the Defendants as the basis to submit billing to GEICO.

120.    The prescriptions purportedly issued by Referring Providers at the Atlantic Medical Clinics (which are representative of all of the Clinics) were not based upon legitimate examinations

by the Referring Providers that evaluated each Insured's individual symptom or presentation and determined whether and what type of DME to provide.

121.    Rather, these prescriptions were based upon a predetermined fraudulent protocol established by the Clinic Controllers and other John Doe Defendants and were obtained by the Defendants through improper financial arrangements with the Clinic Controllers and other John Doe Defendants.

122.    Furthermore, the initial examination or follow-up examination reports, to the extent that there were contemporaneously dated examination reports issued by the Referring Providers at the Atlantic Medical Clinics, did not accurately identify the Fraudulent Equipment purportedly prescribed to the Insureds. In fact, the reports did not contain sufficient information describing the medical necessity of the prescribed Fraudulent Equipment.

123.    Even more, the follow-up examination reports from the Referring Providers at the Atlantic Medical Clinics failed to include any meaningful information regarding the Insureds' use of the previously prescribed Fraudulent Equipment, to the extent it was even mentioned at all.

124.    Furthermore, and in keeping with the fact that the prescriptions for Fraudulent Equipment were not medically necessary and were obtained as part of a predetermined fraudulent protocol, there were often significant delays between the date on which the prescription was issued by the Referring Providers at the Atlantic Medical Clinics and the date on which it was delivered to the Insured.

125.    For example:

(i)    Insured NC was allegedly involved in a motor vehicle accident on January 10, 2024. On January 18, 2024, Hong Xu purportedly issued a prescription for a LLLT Device, Pain Shield Pro, and Pain Shield Patch Kit to NC, which was purportedly delivered to NC on May 3, 2024 by Diversified Orthotics, over three months after the prescription was issued.

(ii)     Insured VS was allegedly involved in a motor vehicle accident on January 3, 2024. On January 9, 2024, Kopach purportedly issued a prescription for a LLLT Device, Pain Shield Pro, and Pain Shield Patch Kit to VS, which was purportedly delivered to VS on March 15, 2024 by Diversified Orthotics, over two months after the prescription was issued.

(iii)    Insured TS was allegedly involved in a motor vehicle accident on January 2, 2024. On January 11, 2024, Houslin purportedly issued a prescription for a LLLT Device, Pain Shield Pro, and Pain Shield Patch Kit to TS, which was purportedly delivered to TS on March 13, 2024 by Diversified Orthotics, over two months after the prescription was issued.

(iv)    Insured JD was allegedly involved in a motor vehicle accident on January 6, 2024. On January 12, 2024, Sikand purportedly issued a prescription for a LLLT Device and Pain Shield Pro to JD, which was purportedly delivered to JD on March 13, 2024 by Diversified Orthotics, over two months after the prescription was issued.

(v)     Insured JD was allegedly involved in a motor vehicle accident on January 18, 2024. On January 24, 2024, Sikand purportedly issued a prescription for a LLLT Device, Pain Shield Pro, and Pain Shield Patch Kit to JD, which was purportedly delivered to JD on March 13, 2024 by Diversified Orthotics, a month and a half after the prescription was issued.

(vi)    Insured EK was allegedly involved in a motor vehicle accident on January 24, 2024. On January 25, 2024, Houslin purportedly issued a prescription for a LLLT Device, Pain Shield Pro, and Pain Shield Patch Kit to EK, which was purportedly delivered to EK on March 12, 2024 by Diversified Orthotics, a month and a half after the prescription was issued.

(vii)   Insured EO was allegedly involved in a motor vehicle accident on January 19, 2024. On February 14, 2024, Jagga purportedly issued a prescription for a LLLT, Pain Shield Pro, and Pain Shield Patch Kit to EO, which was purportedly delivered to EO on April 1, 2024 by Diversified Orthotics, a month and a half after the prescription was issued.

(viii)  Insured MVA was allegedly involved in a motor vehicle accident on January 22, 2024. On January 30, 2024, Hong Xu purportedly issued a prescription for a LLLT Device, Pain Shield Pro, and Pain Shield Patch Kit to MVA, which was purportedly delivered to MVA on March 12, 2024 by Diversified Orthotics, a month and a half after the prescription was issued.

(ix)    Insured AAG was allegedly involved in a motor vehicle accident on January 22, 2024. On January 30, 2024, Hong Xu purportedly issued a prescription for a LLLT Device, Pain Shield Pro, and Pain Shield Patch Kit to AAG, which was purportedly delivered to AAG on March 11, 2024 by Diversified

Orthotics, almost a month and a half after the prescription was issued.

(x)     Insured DC was allegedly involved in a motor vehicle accident on January 28, 2024. On January 30, 2024, Sikand purportedly issued a prescription for a LLLT Device and Pain Shield Pro to DC, which was purportedly delivered to DC on March 9, 2024 by Diversified Orthotics, over a month after the prescription was issued.

126.    These are only representative examples.

127.    By submitting bills to GEICO seeking No-Fault Benefits for the Fraudulent Equipment, the Defendants represented that they provided Insureds with DME/OD that was medically necessary, as determined by a healthcare provider licensed to prescribe DME/OD.

128.    However, the Fraudulent Equipment was not medically necessary. Rather it was prescribed pursuant to predetermined fraudulent protocols and collusive kickback arrangements among the Defendants.

### a.     Medically Unnecessary Prescriptions for Pain Shield Pro Devices (K1004) and Painshield Patches (K1036)

129.    As part of the fraudulent scheme established between the Defendants, Clinic Controllers, and John Doe Defendants, the Referring Providers prescribed and the Defendants purportedly dispensed Pain Shield Pro Devices resulting in charges of $3,300.00 per Insured, coupled with Pain Shield Patches resulting in additional charges of $799.99 per Insured who purportedly received the device.

130.    A Pain Shield Pro Device is intended to apply ultrasonic energy to generate deep heat within body tissues for the treatment of selected medical conditions such as: pain; muscle spasms; and joint contractures.

131.    The prescriptions for Pain Shield Pro Devices utilized the Fraudulent Prescription Forms, which stated the Pain Sheild Pro Devices were being prescribed pursuant to a "conservative therapy regiment".

132.    Contrary to the Fraudulent Prescription Forms stating the Pain Shield Pro Devices were being prescribed as part of "conservative therapy regiment," in a legitimate clinical setting, treatment for the neck, back, or shoulder pain experienced post-automobile accident should begin with the medically accepted conservative therapies which include bed rest, active exercises, physical therapy, heating or cooling modalities, massage, and basic, non-steroidal anti-inflammatory analgesics, such as ibuprofen or naproxen sodium.

133.    If such conservative treatment does not resolve the patient's symptoms, the standard of care can include other conservative treatment modalities such as chiropractic treatment, physical therapy, and the use of pain management medication. These clinical approaches are well-established.

134.    Indeed, virtually all Insureds who were prescribed a Pain Shield Pro Device were already enrolled in a multidisciplinary course of treatment at the Clinics, including physical therapy and/or chiropractic care.

135.    Various commercial insurers have issued policy bulletins that make clear that ultrasonic diathermy devices, such as the Pain Shield Pro, are experimental and investigational. Notwithstanding the experimental and investigational nature of ultrasonic diathermy devices, Referring Providers repeatedly prescribed the expensive Pain Shield Pro Device to Insureds solely to maximize profits without regard to genuine patient care.

136.    In response to the medically unnecessary prescriptions for the Pain Shield Pro Devices and Pain Shield Patches, the Defendants always billed GEICO using HCPCS Code K1004 with a charge of $3,300.00 and HCPCS Code K1036 with a charge of $799.99.

137.    For these reasons in each of the claims identified in Exhibit "1" the Defendants falsely represented that the Pain Shield Pro Devices and Pain Shield Patches were medically

necessary, and were, therefore, eligible to collect No-Fault Benefits, when, in fact, the prescriptions were for medically unnecessary pieces of Fraudulent Equipment prescribed by the Referring Providers pursuant to predetermined fraudulent protocols and routed to the Defendants pursuant to the Defendants' fraudulent scheme.

### b. Medically Unnecessary Prescriptions for LLLT Devices

138.   As part of the fraudulent scheme established between the Defendants, Clinic Controllers, and John Doe Defendants, the Referring Providers prescribed and the Defendants purportedly dispensed LLLT Devices resulting in charges of $2,400.00 per Insured who purportedly received the device.

139.   According to the Fraudulent Prescription Forms, Referring Providers purportedly issued the prescriptions for LLLT Devices to Insureds for pain relief.

140.   However, virtually none of the prescriptions issued by the Referring Providers specified what area of the body to apply the LLLT Device to or the duration of use to alleviate pain.

141.   LLLT Devices are considered investigational and experimental in the medical industry and have not been proven effective for treating the types of injuries sustained by Insureds involved in "fender-bender" type automobile accidents.

142.   Indeed, the United States Food and Drug Administration has not issued any conclusions about the effectiveness of LLLT because of a paucity of comprehensive, large-scale clinical studies.

143.   Further, except under very specific circumstances involving the prevention of oral mucositis in an individual undergoing certain cancer treatment, commercial insurers do not deem LLLT Devices as medically necessary, nor do they provide reimbursement for LLLT Devices. For

example, Aetna cites inadequate evidence showing an LLLT Device's effectiveness for the types of minor musculoskeletal injuries and symptoms typically experienced by Insureds involved in minor automobile accidents.

144.    However, despite a lack of medical utility for the LLLT Devices, Defendants received prescriptions purportedly issued by the Referring Providers for LLLT Devices without regard to genuine patient care and solely to maximize profits and allow Diversified Orthotics to charge GEICO $2,400.00 under HCPCS Code E0221 for purportedly delivering these devices to Insureds.

145.    For these reasons in each of the claims identified in Exhibit "1" the Defendants falsely represented that the LLLT Devices were medically necessary, and were, therefore, eligible to collect No-Fault Benefits, when, in fact, the prescriptions were for medically unnecessary pieces of Fraudulent Equipment prescribed by the Referring Providers pursuant to predetermined fraudulent protocols and routed to the Defendants pursuant to the Defendants' fraudulent scheme.

**C.    Defendants' Fraudulent Misrepresentations Regarding the DME Purportedly Dispensed**

146.    In addition to obtaining medically unnecessary prescriptions based upon predetermined fraudulent protocols, collusive arrangements with the John Doe Defendants and dispensing the Fraudulent Equipment without a licensed healthcare provider determining the specific DME was medically necessary, Defendants submitted bills to GEICO that misrepresented the DME provided to the Insureds – to the extent that any DME actually was provided.

147.    Specifically the Defendants submitted billing for Non-Fee Schedule items that represented the charges were less than or equal to the maximum reimbursement rate allowable under the Fee Schedule, when in fact they were not.

148.    As indicated above, under the No-Fault Laws, Non-Fee Schedule items are reimbursable as the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the same item.

149.    By submitting bills to GEICO for Non-Fee Schedule items, Defendants represented that they requested permissible reimbursement amounts that were calculated as the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the specific item.

150.    However, in virtually all of the charges to GEICO identified in Exhibit "1" for Non-Fee Schedule items, Defendants fraudulently represented to GEICO that the reimbursement sought was the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the same item.

151.    Instead, Defendants submitted bills to GEICO with charges that significantly inflated the permissible reimbursement amount of Non-Fee Schedule items in order to maximize the amount of No-Fault Benefits they were able to obtain from GEICO and other automobile insurers.

152.    Defendants were able to perpetrate this scheme to fraudulently overcharge Non-Fee Schedule items by providing Insureds – to the extent they actually provided any Fraudulent Equipment – with low-cost and low-quality Fraudulent Equipment.

153.    When Defendants submitted bills to GEICO seeking No-Fault Benefits for Non-Fee Schedule items, the charges fraudulently represented 150% of Defendants' acquisition cost of purportedly high-quality items. In actuality, Defendants' legitimate acquisition cost for the low-quality items was significantly less.

154.    In keeping with the fact that Defendants fraudulently represented the permissible reimbursement amounts in the bills submitted to GEICO for the Non-Fee Schedule items solely

for their financial benefit, Defendants purposefully attempted to conceal their effort to overcharge GEICO for Non-Fee Schedule items by never submitting a copy of their acquisition invoices in conjunction with their bills.

155.    Defendants did not include invoices showing their legitimate cost to acquire the low-cost and low-quality Non-Fee Schedule items in the bills submitted to GEICO because the invoices would have shown that the permissible reimbursement amounts were significantly less than the charges contained in the bills.

156.    As part of this scheme, the charges submitted to GEICO for Non-Fee Schedule items identified in Exhibit "1" virtually always misrepresented the permissible reimbursement amount.

157.    For example, Defendants billed GEICO for multiple types of Non-Fee Schedule Fraudulent Equipment, including following Non-Fee Schedule items:

| Item | Code | Charge |
|------|------|--------|
| Pain Shield Pro Devices | K1004 | $3,300.00 |
| Pain Shield Patches | K1036 | $799.00 |
| LLLT Devices | E0221 | $2,400.00 |

158.    Defendants were able to perpetrate this scheme to fraudulently overcharge for Non-Fee Schedule items by providing Insureds – to the extent they actually provided any Fraudulent Equipment – with low-cost and low-quality Fraudulent Equipment.

159.    In each of the claims identified within Exhibit "1" for Non-Fee Schedule items, Defendants fraudulently misrepresented in the bills submitted to GEICO that the charges were the lesser of 150% of the acquisition cost or the cost to the general public.

160.    In addition to misrepresenting the maximum reimbursement rates the Defendants were entitled to receive for the Fraudulent Equipment, and as part of the Defendants' scheme to inflate their billing to GEICO, the Defendants misrepresented that they provided Insureds with up

to three separate LLLT Devices when the prescriptions only called for a single device.

161.     Specifically, in response to prescriptions for a singular LLLT Device, the Defendants instead billed GEICO for purportedly providing Insureds with as many as three separate LLLT Devices at $2,400.00 per unit.

162.     This double and triple billing resulting in over $100,000.00 in fabricated charges to GEICO for phantom devices.

163.     In the bills submitted to GEICO, and as shown in the charges identified in Exhibit "1", Defendants regularly misrepresented and inflated the charges submitted to GEICO for Non-Fee Schedule items, to the extent that any Fraudulent Equipment was provided, in order to maximize the amount of No-Fault Benefits that they could obtain from GEICO.

**D.     The Fraudulent Billing Defendants Submitted or Caused to be Submitted to GEICO**

164.     To support their fraudulent charges, Defendants systematically submitted or caused to be submitted hundreds of NF-3 forms, HCFA-1500 forms, and/or treatment reports to GEICO through and in the name of Diversified Orthotics, seeking payment for the Fraudulent Equipment.

165.     The NF-3 forms, HCFA-1500 forms, and treatment reports that Defendants submitted or caused to be submitted to GEICO were false and misleading in the following material respects:

    (i)     The NF-3 forms, HCFA-1500 forms, and the prescriptions uniformly misrepresented to GEICO that the Defendants provided Fraudulent Equipment pursuant to legitimate prescriptions from licensed healthcare providers for reasonable and medically necessary DME and/or OD and therefore were entitled to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because, to the extent that the Defendants provided any Fraudulent Equipment, it was pursuant to a fraudulent scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols;

38

(ii)     The NF-3 forms, HCFA-1500 forms, and the prescriptions uniformly misrepresented to GEICO that the Defendants provided Fraudulent Equipment pursuant to legitimate prescriptions from licensed healthcare providers for reasonable and medically necessary DME and/or OD and therefore were entitled to receive No-Fault Benefits.  In fact, the Defendants were not entitled to receive No-Fault Benefits because, to the extent that the Defendants provided any Fraudulent Equipment, it was pursuant to a fraudulent scheme that included dispensing Fraudulent Equipment (a) based on prescriptions secured through collusive arrangements with the John Doe Defendants, and (b) based on prescriptions that were otherwise illegitimate because they contained photocopied, electronically generated, and/or otherwise duplicated signatures; and

(iii)    The NF-3 forms, HCFA-1500 forms, and treatment reports, prescriptions, and delivery receipts uniformly misrepresented to GEICO the reimbursement amount for the Non-Fee Schedule items provided to the Insureds, to the extent that Defendants provided any Fraudulent Equipment, and therefore were entitled to receive No-Fault Benefits. In fact, Defendants were not entitled to receive No-Fault Benefits because – to the extent that Defendants provided any Fraudulent Equipment to the Insureds – they falsified the permissible reimbursement amounts for Fraudulent Equipment identified in the NF-3 forms, HCFA-1500 forms.

## III.     The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

166.    Defendants legally and ethically are obligated to act honestly and with integrity in connection with the provision of DME and OD to Insureds, and their actual submission of charges to GEICO.

167.    To induce GEICO to promptly pay the charges for Fraudulent Equipment, Defendants have gone to great lengths to systematically conceal their fraud.

168.    Specifically, Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the provision of the Fraudulent Equipment was pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit Defendants and others not presently known (i.e. the John Doe Defendants), without regard for genuine patient care.

169.    Additionally, Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the provision of the Fraudulent Equipment was pursuant

to an insurance fraud scheme, which included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, including prescriptions secured through collusive arrangements, and were otherwise illegitimate because they contained photocopied, electronically generated, and/or otherwise duplicated signatures.

170.    Defendants also knowingly misrepresented the permissible reimbursement amount of the Non-Fee Schedule items contained in the bills submitted by Defendants to GEICO and did not include any invoices to support the charges in order to prevent GEICO from discovering that Non-Fee Schedule items were billed to GEICO for financial gain.

171.    The Defendants hired law firms to pursue collection of the charges associated with the Fraudulent Equipment from GEICO and other insurers.  These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

172.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $497,000.00 based upon the fraudulent charges representing payments made by GEICO to Defendants.

173.    Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

**FIRST CAUSE OF ACTION**
**Against Diversified Orthotics**
**(Declaratory Judgment, 28 U.S.C. §§ 2201 and 2202)**

174.    GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

175.    There is an actual case in controversy regarding more than $700,000.00 in fraudulent billing that has been submitted to GEICO in the name of Diversified Orthotics.

176.    Diversified Orthotics have no right to receive payment for any pending bills submitted to GEICO because the bills submitted to GEICO for Fraudulent Equipment were based not upon medical necessity but were submitted as part of an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known (i.e. the John Doe Defendants), without regard for genuine patient care.

177.    Diversified Orthotics have no right to receive payment for any pending bills submitted to GEICO because the bills submitted to GEICO for Fraudulent Equipment were pursuant to an insurance fraud scheme, which included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, including prescriptions secured through collusive arrangements, and were otherwise illegitimate because they contained photocopied, electronically generated, and/or otherwise duplicated signatures.

178.    Diversified Orthotics have no right to receive payment for any pending bills submitted to GEICO because – to the extent Diversified Orthotics provided any Fraudulent Equipment – Diversified Orthotics fraudulently misrepresented that the charges for Non-Fee Schedule items contained within the bills to GEICO were less than or equal to the maximum permissible reimbursement amount.

41

179.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Diversified Orthotics has no right to receive payment for any pending bills submitted to GEICO under the name of Diversified Orthotics.

**SECOND CAUSE OF ACTION**
**Against Rose**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

180.    GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

181.    Diversified Orthotics is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

182.    Rose knowingly conducted and/or participated, directly or indirectly, in the conduct of Diversified Orthotics' affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges seeking payments that the Diversified Orthotics enterprise was not entitled to receive under the No-Fault Laws, because: (i) the bills submitted to GEICO for the provision Fraudulent Equipment were based not upon medical necessity but were submitted pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, including based on prescriptions that were photocopied, electronically generated, and/or unauthorized; and (ii) Defendants submitted bills to GEICO for Fraudulent Equipment, to the extent that any Fraudulent Equipment was actually provided, that misrepresented that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible

42

reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount.

183.    A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

184.    Diversified Orthotics' business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Rose operates Diversified Orthotics, insofar as Diversified Orthotics is not engaged as a legitimate supplier of DME and/or OD, and therefore, acts of mail fraud are essential for Diversified Orthotics to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that Diversified Orthotics and Rose continue to attempt collection on the fraudulent billing to the present day, posing a distinct threat of years of continued criminal activity.

185.    Diversified Orthotics is engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by Diversified Orthotics in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

186.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $497,000.00 pursuant to the fraudulent bills submitted through Diversified Orthotics.

187.    By reason of its injury, GEICO is entitled to treble damages, costs, reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), equitable relief pursuant to 18 U.S.C. § 1964(a) to prevent and restrain any further collection on the fraudulent billing, and any other relief the

Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against Rose and John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

188.    GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

189.    Diversified Orthotics is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

190.    Rose and the John Doe Defendants are owners of, employed by, or associated with the Diversified Orthotics enterprise.

191.    Rose and the John Doe Defendants knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Diversified Orthotics' affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis seeking payments that Diversified Orthotics was not eligible to receive under the New York No-Fault Laws because: (i) the bills submitted to GEICO for the provision Fraudulent Equipment were based not upon medical necessity but were submitted pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, including based on prescriptions that were photocopied, electronically generated, and/or unauthorized; and (ii) Defendants submitted bills to GEICO for Fraudulent Equipment, to the extent that any Fraudulent Equipment was actually provided, that misrepresented that the reimbursement

rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount.

192.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

193.    Rose and the John Doe Defendants knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

194.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $497,000.00 pursuant to the fraudulent bills submitted through Diversified Orthotics.

195.    By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## FOURTH CAUSE OF ACTION
### Against Diversified Orthotics and Rose
### (Common Law Fraud)

196.    GEICO repeats and realleges each and every allegation set forth above as through fully set forth at length herein.

197.    Diversified Orthotics and Rose intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for Fraudulent Equipment.

198.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that the Fraudulent Equipment that was dispensed was for reasonable and medically necessary DME and/or OD when in fact it was dispensed pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols; (ii) in every claim, that the Fraudulent Equipment dispensed was pursuant to a legitimate prescription from a licensed healthcare provider, when in fact the Fraudulent Equipment was dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants, and based on prescriptions that were otherwise illegitimate because they contained photocopied, electronically generated, and/or otherwise duplicated signatures; and (iii) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of fraudulent activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

199.    Diversified Orthotics and Rose intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Diversified Orthotics that were not compensable under the No-Fault Laws.

46

200.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $497,000.00 pursuant to the fraudulent bills submitted by Defendants through Diversified Orthotics.

201.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

202.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other further relief the Court deems just and proper.

### FIFTH CAUSE OF ACTION
**Against Diversified Orthotics and Rose**
**(Unjust Enrichment)**

203.    GEICO repeats and realleges each and every allegation set forth above as though fully set forth at length herein.

204.    As set forth above, Diversified Orthotics and Rose engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

205.    When GEICO paid the bills and charges submitted by or behalf of Diversified Orthotics for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the improper, unlawful, and/or unjust acts of Diversified Orthotics and Rose.

206.    Diversified Orthotics and Rose have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful and unjust billing scheme.

207.    Retention of GEICO's payments by Diversified Orthotics and Rose violates fundamental principles of justice, equity, and good conscience.

208.    By reason of the above, Diversified Orthotics and Rose have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $497,000.00.

## SIXTH CAUSE OF ACTION
### Against the John Doe Defendants
### (Aiding and Abetting Fraud)

209.    GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

210.    The John Doe Defendants knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Diversified Orthotics and Rose.

211.    The acts of the John Doe Defendants in furtherance of the fraudulent scheme included, among other things, knowingly engaging in collusive arrangements with Defendants for the procurement of medically unnecessary prescriptions for Fraudulent Equipment issued pursuant to a pre-determined protocol to maximize profits without regard to patient care and routing those prescriptions directly to Defendants and bypassing the Insureds.

212.    The conduct of the John Doe Defendants in furtherance of the fraudulent scheme was significant and material. The conduct of the John Doe Defendants was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Diversified Orthotics and Rose to submit billing for Fraudulent Equipment and obtain payment from GEICO and other insurers.

213.    The John Doe Defendants aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Diversified Orthotics and Rose for medically unnecessary Fraudulent Equipment because they sought to continue profiting through the fraudulent scheme.

214. The conduct of the John Doe Defendants caused GEICO to pay more than $497,000.00 pursuant to the fraudulent bills submitted through Diversified Orthotics.

215. This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

216. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief that the Court deems just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), GEICO demands a trial by jury.

**WHEREFORE,** Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a judgment be entered in their favor and against the Defendants, as follows:

A. On the First Cause of Action, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Diversified Orthotics and Rose have no right to receive payment for any pending bills submitted to GEICO;

B. On the Second Cause of action against Rose, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $497,000.00, together with treble damages, costs, reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), equitable relief pursuant to 18 U.S.C. § 1964(a) plus interest to prevent and restrain any further collection on the fraudulent billing;

C. On the Third Cause of Action against Rose and John Doe Defendants "1-10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $497,000.00, together with treble damages, costs, reasonable attorneys' fees pursuant to 18 U.S.C.

§ 1964(c), equitable relief pursuant to 18 U.S.C. § 1964(a) plus interest to prevent and restrain any further collection on the fraudulent billing.

D.     On the Fourth Cause of Action against Diversified Orthotics and Rose, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $497,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.     On the Fifth Cause of Action against Diversified Orthotics and Rose, compensations in an amount to be determined at trial but in excess of $497,000.00, plus costs and interest and such other and further relief as this Court deems just and proper; and

F.     On the Sixth Cause of Action against John Doe Defendants "1-10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $497,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper.

Dated: February 10, 2026
       Uniondale, New York

                              RIVKIN RADLER LLP

                              By   /s/ Barry I. Levy

                                   Barry I. Levy
                                   Michael Vanunu
                                   Philip P. Nash
                                   Wallis Levy Granat
                              926 RXR Plaza
                              Uniondale, New York 11556
                              (516) 357-3000

                              *Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*